Paul MARRIOTT, Both Individually, and on Behalf of a Class of Others Similarly Situated; Barbara Davis; and Andy Rivera; Plaintiffs,

v.

COUNTY OF MONTGOMERY; Montgomery County Sheriff's Department; Michael Amato, Individually, and as Sheriff of the County of Montgomery; Jeffrey Smith, Individually, and as Undersheriff of the County of Montgomery; Kevin Snell, Individually, and as former

---

Undersheriff of the County of Montgomery; John Pecora, Individually, and as Jail Administrator in the Montgomery County Sheriff's Department; and Sue Buddles, Individually, and as Lieutenant in the Montgomery County Sheriff's Department, Defendants.

No. 5:03–CV–531.

United States District Court, N.D. New York.

March 25, 2005.

Beranbaum Menken Ben–Asher & Bier- man LLP (Bruce E. Menken, Esq., Jason J. Rozger, Esq., of counsel), New York City, for plaintiff.

Elmer R. Keach, III, Esq., Albany, NY, for Plaintiff.

Mason Law Firm (Gary E. Mason, Esq., of counsel), Washington, DC, for Plaintiff.

Wilson Elser Moskowitz Edelman & Dick- er LLP (Theresa B. Marangas, Esq., Thomas W. Hyland, Esq., of counsel), Albany, NY, for Defendants.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

### I. INTRODUCTION

Plaintiff Paul Marriott ("Marriott") filed this action individually and on behalf of a class of others similarly situated alleging that the policy of the Montgomery County Jail ("the Jail") providing for the search of all admittees constitutes a strip search in viola- tion of the Constitution of the United States. An amended complaint was filed on October 4, 2004, with the consent of all parties. The amended complaint included two additional plaintiffs, Barbara Davis ("Davis") and Andy Rivera ("Rivera").

Plaintiffs moved to certify the class pursu- ant to Fed.R.Civ.P. 23 and for a preliminary injunction. Defendants opposed and cross moved for summary judgment. Plaintiffs op- posed the cross motion.

Defendants appealed the July 7, 2004, Or- der of Hon. David E. Peebles, United States Magistrate Judge, compelling the production of two letters dated March 26, 2004, and one letter dated April 20, 2004, from defense counsel to Dora L. Hurd ("Hurd"), a non- party witness employed at the Jail during the relevant time period. Plaintiffs opposed.

Oral argument was heard on October 22, 2004, in Albany, New York. Decision was reserved.

On December 22, 2004, Clarendon Insur- ance Company ("Clarendon") moved to inter- vene. Defendants noted that they would not be making any submissions with regard to the motion to intervene. Plaintiffs opposed. Clarendon's motion to intervene was taken

on submission of the papers, without oral argument.

## II. BACKGROUND

A written Jail policy provides procedures for admitting/booking inmates into the Jail. The admissions policy, effective July 1, 1996,[1] provides for an initial pat-down search of admittees upon their entrance into the facility. (See Pltfs.' Ex. D.) A separate policy defines different types of searches and delineates the circumstances in which each should be used, as will be discussed momentarily. (See Pltfs.' Ex. B.)

Upon a determination that the admittee would be housed at the Jail (in other words, would not make bail) the policy provides for an officer to facilitate the admittees' change from street clothes into Jail attire, as follows:

the booking officer will escort the inmate to the shower area where the inmate will disrobe and place all clothes in the bag provided by the officer, and be required to take a shower. A. All persons and personal property shall be searched in accordance to the law. Solely to prevent the introduction of contraband to the facility....

(Pltfs.' Ex. D ¶ 12.) Defendants refer to this portion of the admission process as a "change-out" procedure. Pursuant to this policy, when an admittee is being processed, a Corrections Officer ("CO") (who is the same sex as the admittee) has him or her remove all of their clothing and place it in a bag. The admittee then must shower.

Defendant John Pecora ("Pecora"), Jail Administrator at the relevant times, testified that during the change-out, the CO viewed the naked inmate through a window to see if there were any gang tattoos indicating gang affiliation. (Pltfs.' Ex. H, Pecora Dep. at 122–23, 126–35, Ex. I, Pecora Dep. at 58–59.) Richard Denton ("Denton"), a CO and supervisor at the Jail from 1994 to 2003, testified that during the change-out he would stand in the shower room while an admittee disrobed and put his street clothes into a bag. (Pltfs.' Ex. K, Denton Dep. at 35–36, 51–52.) Denton stated that he visually would observe an admittee as he disrobed, noting any tattoos generally (not gang tattoos), and contraband. Id. at 38, 88–89, 105. However, he did not consider this a search but rather an observation. See id. at 38.

Defendant Susan D. Buddles ("Buddles") was employed as a part-time CO at the Jail beginning in 1992. She was promoted to supervisory positions, which she held during the relevant time periods. Buddles testified that the purpose of the change-out was to be sure the inmate was not injured or bruised, to become aware of any scars or tattoos, and, most importantly, to prevent the introduction of contraband into the Jail. (Pltfs.' Ex. J, Buddles Dep. at 34–35.) She stated that only female COs changed-out female inmates, and only male COs changed-out male inmates. Id. at 37. The only instance of a gang-related tattoo of which she was aware was of a tear drop near the eye, signifying membership in the Blood gang. Id.

Donald F. Gardner, a CO at the Jail from 1986 to 2002, testified that he moved around during the change-out. (Pltfs.' Ex. L, Gardner Dep. at 57.) However, he stated that an admittee's genitals could be seen during the change-out. Id. at 57–58. Additionally, he testified that the purpose of the change-out was for hygiene, not to detect contraband and not to detect tattoos. Id. at 57.

Hurd, a CO at the Jail from 2000 to 2002, testified that she stayed in the shower area while the admittee was changing and looked at the naked admittee to be sure that all of her clothing had been taken off and put in the property bag. (Pltfs.' Ex. M, Hurd Dep. at 40–41.) Assuring that all the admittee's clothing was in the property bag prevented contraband from entering the Jail, according to Hurd. Id. at 42. She never heard of a gang tattoo search, and was never instructed to look for gang tattoos during a change-out. Id. at 55, 79–80. Further, she knew of no one else who did so. Id. at 79–80.

Aaron L. Robinson was a CO at the Jail between February 2001 and February 2002. He also stood in the shower room while the admittee changed clothes, and was positioned so that he could see most of the naked body

1. A new policy became effective on May 21, 2003, that was revised to reflect a new sheriff and jail administrator. The language regarding the admission procedure was not changed.

and partly see the genitals. (Pltfs.' Ex. N, Robinson Dep. at 25–27.) In addition to observing the naked body of the admittee, Robinson asked them to turn around, and to hold their arms out in front of them and squat. *Id.* at 28–29. He did not ask them to bend over, lift or manipulate their genitals, or spread their buttocks. *Id.* Robinson stated that he did not look for tattoos during a change-out. *Id.* at 121. He stated that the purpose of the change-out was to prevent contraband (the squat was required to be sure the admittee was not hiding anything.) *Id.* at 76, 79. Robinson also opined that the change-out was not a search. *Id.* at 71.

After showering, the admittee dried off, then donned prison garb that was provided to him or her. The admissions policy, hence the change-out procedure, applies to everyone who is admitted to the Jail.

In addition to a written policy for admissions/booking, the Jail has a written policy pertaining to searches.[2] According to the search policy, a strip search was defined as "A visual examination of an inmate's naked body and physical examination of the inmate's clothing for contraband and/or injuries and physical abnormalities." (Pltfs.' Ex. B.) According to the policy, strip searches "may" be conducted upon admission, after contact visits, on return from a temporary release program and work detail outside the facility, prior to and upon returning from any trip outside the facility, and "as authorized by the shift supervisor whenever there are reasonable grounds to believe the inmate possesse[d] contraband which may not be detected by a pat search or metal detector search." *Id.*

Pecora testified that a strip search always was conducted after an inmate was outside the facility, such as on work release, without regard to reasonable suspicion. (Pltfs.' Ex. H, Pecora Dep. at 164–65.) Included in the strip search is a visual check of the all body cavities. (Pltfs.' Ex. B.) Denton described a

strip search as follows: the inmate would disrobe, squat down, cough, lift their genital sack, and open their mouth and the CO would look in the inmate's open mouth, run his fingers through the inmate's hair, and spread their buttocks. (Pltfs.' Ex. K, Denton Dep. at 34.)

Pecora described the circumstances in which a strip search could be conducted, although it was not required. If there was reasonable suspicion that an inmate had contraband or a weapon, the supervisor could authorize a strip search. (Pltfs.' Exp. I, Pecora Dep. at 11–12.) Pecora elaborated that if an admittee were going to be housed in the Jail, and there was reason to believe that the person was hiding contraband, was "highly assaultive," or otherwise was "a high risk individual with high charges" then the supervisor could require a strip search. *Id.* at 19–20. Denton noted that if contraband were discovered during the change-out process, a strip search could be conducted. (Pltfs.' Ex. K, Denton Dep. at 65–66.)

If it was determined that a strip search was needed for an admittee, then it would take place in the shower area either before or after the shower. (Pltfs.' Exp. I, Pecora Dep. at 58–60; Pltfs.' Ex. K, Denton Dep. at 72.) The CO would be in the shower area directing the admittee during the strip search. (Pltfs.' Ex. I, Pecora Dep. at 58–60, Ex. K, Denton Dep. at 66.)

Denton also noted that a list was posted on the wall in the booking room listing certain Penal Code sections, or "strip-searchable offenses." (Pltfs.' Ex. K, Denton Dep. at 56.) The CO conducting the booking would compare the Penal Code section under which an admittee was charged to the list to determine if a strip search was permissible. *Id.* 56–61. If the charge matched the list, then it was permissible, but not required, to conduct a strip search.[3] *Id.* Buddles testified that the list of strip-searchable offenses posted in the

---

**2.** This policy covers pat, strip, body cavity, metal detector, overall, and area searches. (Pltfs.' Ex. B.) Only strip searches are relevant to the issues at hand.

**3.** Under the table of strip searchable penal law offenses, it stated: "This is a list of offenses for

which strip searches may be automatically conducted at admission. It does not limit the right to do searches if their [sic] is reasonable suspicion that the inmate is concealing contraband." (Pltfs.' Ex. O.)

booking room did not stand on its own—other reasons must be present before a strip search was conducted. (Pltfs.' Ex. J, Buddles Dep. at 167–69.) Gardner testified that whether or not a charge was on the list, he would consider the admittee's nature, actions, type of clothing, and personal property in determining whether to conduct a strip search at admission. (Pltfs.' Ex. L, Gardner Dep. at 39–46.) Robinson testified that he was not aware of the charge against an admittee at the time he performed the change-out. (Pltfs.' Ex. N, Robinson Dep. at 38.) Hurd did not recall ever having seen the strip-searchable offenses list. (Pltfs.' Ex. M, Hurd Dep. at 55–58.)

Marriott was admitted to the Jail on Sept. 13, 2001, on misdemeanor Agriculture and Markets violations relating to failure to feed and water five horses. After the initial questioning and fingerprinting in the booking process, he was taken to the shower room. A CO told him to remove all of his clothing, shake it out as he took it off, and to take a shower, which he did. The CO watched him undress and shower. After the shower, while completely naked, the CO told Marriott to lift up his arms, open his mouth, and show the CO the bottoms of his feet. Marriott was also required to bend over in front of the CO and spread the lobes of his buttocks. He was then told to dress in a Jail uniform, which he did. Marriott was released the next day after bail was posted.

Davis was arrested at her home on May 2, 2001, after missing a court date in Family Court. She was brought before a Family Court judge, who informed her that she would be jailed until she paid $2,000.00 in past-due child support. Her arrest and incarceration rested upon a civil family court warrant, not related to any criminal offense. Upon her arrival at the Jail, the booking officer questioned her. Then a female CO escorted her to the shower room. The CO directed her to remove all of her clothing and take a shower. The CO watched her shower. After the shower, while Davis was completely naked, the CO ordered her to lift up her arms and open her mouth. The CO also required Davis to bend over in front of her and spread the lobes of her buttocks. Davis

was released three days later, when her brother posted the $2,000.00 for her.

Rivera was admitted to the Jail on June 1, 2004, on a misdemeanor second degree aggravated harassment charge. After the initial admissions paperwork, a CO took him the shower room. A CO required Rivera to remove all of his clothing, including his underwear, and submit to a visual inspection. Rivera then donned the Jail clothing provided to him.

Non-party Jacqueline Ashline ("Ashline") asserts that she has agreed to serve as a named plaintiff and class representative. On April 6, 2001, Ashline was brought to the Jail as a pre-trial detainee. She was charged with driving while intoxicated, a Vehicle and Traffic Law offense. After being fingerprinted, she was taken by a female CO to the shower room. The CO required her to remove all of her clothing and take a shower. She complied. The CO watched Ashline disrobe and shower. After showering, Ashline dried off. The CO left the shower room and then passed a Jail uniform to Ashline through a window in the room for her to put on.

The named plaintiffs and Ashline contend that they are representatives of a class defined as follows:

> All persons in the United States who have been or will be placed into the custody of the Montgomery County Jail after being charged with misdemeanors, violations, violations of probation or parole, traffic infractions or other minor crimes, or held on civil matters, and were or will be strip searched upon their entry into the Montgomery County Jail pursuant to the policy, custom and practice of the Montgomery County Sheriff's Department and the County of Montgomery. The class period commences on April 29, 2000, and extends to the date on which the Montgomery County Sheriff's Department and/or the County of Montgomery are enjoined from, or otherwise cease, enforcing their unconstitutional policy, practice and custom of conducting strip searches absent reasonable suspicion. Specifically excluded from the proposed class are Defendants, and all of their respective affiliates, legal repre-

sentatives, heirs, successors, employees or assignees.

(Am.Compl.¶ 18.)

## III. *DISCUSSION*

Clarendon seeks intervention in order to make arguments in support of defendants' cross motion for summary judgment. Accordingly, the motion to intervene will be addressed first. Although defendants' motion for summary judgment was made by cross motion, it will be addressed second since a disposition in defendants' favor would render the remaining questions moot. The remaining issues, the appeal of the Magistrate Judge's decision, plaintiffs' motion for class certification, and the plaintiffs' motion for preliminary injunctive relief, will then be addressed.

### A. *Motion to Intervene*

Intervention is permitted when a conditional right to intervene is conferred by a federal statute and "when an applicant's claim or defense and the main action have a question of law or fact in common." Fed. R.Civ.P. 24(b). Timeliness of the motion to intervene is a threshold requirement. *Id.; United States v. Pitney Bowes, Inc.,* 25 F.3d 66, 74 (2d Cir.1994).

■ The court exercises discretion in determining whether to permit intervention, while considering "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Fed.R.Civ.P. 24(b). "Additional relevant factors 'include the nature and extent of the intervenors' interests,' the degree to which those interests are 'adequately represented by other parties,' and 'whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented.'" *H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc.,* 797 F.2d 85 (2d Cir.1986) (quoting *Spangler v. Pasadena City Bd. of Ed.,* 552 F.2d 1326, 1329 (9th Cir.1977) (footnote omitted), as quoted in *United States Postal Serv. v. Brennan,* 579 F.2d 188, 191–92 (2d Cir.1978)).

■ Here, Clarendon insured Montgomery County for the year 2002, within the range of the proposed class definition. Clarendon asserts that by virtue of its status as an insurer, it has a significant interest in the outcome of plaintiffs' motion for class certification and defendants' cross motion for summary judgment. However, it has no claim or defense, therefore no question of law or fact common to the main action. That Clarendon has no claim or defense is established by its reliance upon the defendants' Amended Answer. (Reply Aff. ¶ 4; *see also* Fed.R.Civ.P. 24(c) (requiring that a motion to intervene "be accompanied by a pleading setting forth the claim or defense for which intervention is sought".)) Further, Clarendon seeks to intervene solely to argue an issue on the pending motions, not to become a party to the action, indicating that it is not asserting any claim or defense. Intervention would be improper, where, as here, there is no question of law or fact in common with the main action because there is no asserted claim or defense. *See* Fed.R.Civ.P. 24(b); *cf. Metzler v. Bennett,* No. 97–CV–0148, 1998 WL 187454, at *10 (N.D.N.Y. Apr. 15, 1998) (denying motion for intervention where no common question of law or fact because applicants' claims based on different statutory provisions which arose out of different factual context).

Clarendon argues that its interest in the outcome of the motions bears upon the determination of the motion to intervene. It first cites the relevance factors of *Brennan,* such as the nature and extent of the intervenor's interest. However, these factors are considered by a court in determining whether to permit intervention as set forth in Rule 24(b), that is, whether intervention will cause undue delay or prejudice in the adjudication of the rights of the original parties. *See Brennan,* 579 F.2d at 191–92. Consideration of the factors presupposes that the applicable prerequisite of the Rule–"when an applicant's claim or defense and the main action have a question of law or fact in common"–is met. *See* Fed.R.Civ.P. 24(b). Here the prerequisite has not been met therefore consideration of the *Brennan* factors is irrelevant.

Clarendon also cited *Hartford Fire Ins. Co. v. Mitlof,* 193 F.R.D. 154 (S.D.N.Y.2000), in support of permitting an insurance company to intervene when a possibility existed that its policy would be implicated by a judgment in the action. In *Mitlof,* the court found intervention appropriate under Rule 24(a), intervention as of right. Rule 24(a), in contrast to 24(b) which is at issue here, allows intervention when an interest is claimed "'relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.'" *Mitlof,* 193 F.R.D. at 161 (quoting Fed.R.Civ.P. 24(a)). Thus, it was appropriate for the *Mitlof* Court to assess the insurer's interest in the determination at issue in the main action as well as its ability to protect its interest. *See Mitlof,* 193 F.R.D. at 160–62 (analyzing the proposed intervenor's interest in the action and the impairment of that interest pursuant to Rule 24(a)). In contrast, here the analysis under Rule 24(b) requires a determination of the existence of a common question of law or fact—not whether the interest claimed relates to the action. *Compare* Fed.R.Civ.P. 24(b) *with* Fed.R.Civ.P. 24(a). Additionally, the applicant in *Mitlof* sought to bring a counterclaim seeking declaratory relief. 193 F.R.D. at 161. Here, Clarendon does not wish to bring any sort of claim—it only wishes to argue an issue on the pending motions. *Mitlof* is factually and legally distinguishable from the case at hand and provides no support for the motion to intervene.

In sum, Clarendon has failed to demonstrate the existence of a common question of law or fact. Therefore, the motion to intervene is denied.

### B. *Defendants' Cross Motion for Summary Judgment*

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When the moving party has met the burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348. At that point, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348.

Defendants seek summary judgment contending that the undisputed facts in the case show that there was no Jail policy or practice of strip searching admittees without regard to reasonable suspicion. At the same time, however, they agree that Jail policy provides that each admittee must completely disrobe in front of an officer and stand while the officer observes the naked body for injury and gang tattoos. (*See, e.g.,* Defs.' Mem. at 3.) After this visual observation by a CO the admittee showers and changes into Jail attire. Defendants term this procedure a change-out, and insist it is not a strip search. The justification for not terming the change-out a strip search lies in the written Jail policy that defines strip search as a "visual[ ] check of the inmate's body, including all body cavities." (Pltfs.' Ex. B at 5.) Defendants contrast the Jail's definitions: the strip search which includes a check of all body

cavities versus the change-out which does not require a body cavity check.

Using any other definition of strip search necessarily negates defendants' argument. Moreover, questions of fact exist as to exactly what the policy and practice is of the Jail with regard to the change-out.

■ The common definition of strip search is "to search (a person) by requiring removal of the clothes." Webster's New World Dictionary 1328 (Victoria Neufeldt & David B. Guralnik, eds., 3d College ed.1988). As a legal term, strip search means "[a] search of a person conducted after that person's clothes have been removed, the purpose usu[ally] being to find any contraband the person might be hiding." Black's Law Dictionary 1378–79 (8th ed.2004). Search is "[a]n examination of a person's body, property, or other area that the person would reasonably be expected to consider as private." *Id.* at 1377. Notably, even the legal definition mentions nothing about a body cavity search being integral to a strip search. It is necessary to look at what took place at the change-out procedure to determine whether it falls within the definition of a strip search.

■ Here, there is no dispute that during the change-out admittees are required to remove all of their clothing in the presence of a CO, without any reasonable suspicion inquiry. Even the COs all agreed that they were present when the admittee removed his or her clothing and the admittee's naked body was visible to them. Where they differ is in the extent and purpose of the ensuing search. For example, Gardner testified that the purpose of the change-out was for hygiene, and not to detect contraband or tattoos. (Pltfs.' Ex. L, Gardner Dep. at 57.) However, he did state that he could see an admittee's genitals during the change-out. *Id.* at 57–58. In contrast, Denton testified that he visually observed an admittee to note tattoos generally and contraband. (Pltfs.' Ex. K, Denton Dep. at 38, 88–89, 105.) Buddles testified that the naked admittee was viewed to find any injuries, tattoos or scars, and for contraband. (Pltfs.' Ex. J, Buddles Dep. at 34–35.) According to Hurd, the purpose of the change-out was to detect contraband, primarily by taking all of the admittee's clothing.

(Pltfs.' Ex. M, Hurd Dep. at 42.) In further contrast, Robinson stated that in addition to viewing the admittee's naked body, he required that they turn around, lift out their arms, and squat. (Pltfs.' Ex. N. Robinson Dep. at 28–29.) His main purpose was to detect contraband, and he did not even look for tattoos. *Id.* at 76, 79, 121. Further, Marriott, Davis, and Ashline testified that in addition to being visually observed while naked they were required to bend over and spread the lobes of their buttocks.

The differences just pointed out in the extent and purpose of the change-out procedure do not change the fact that the admittees are required to strip naked in front of a CO and submit to the observation of their body by the CO. This procedure squarely fits both the common and legal definitions of strip search. At bottom, the defendants' argument is one of semantics, and the argument fails. Defendants' insistence that no strip search occurs is contrary to all the factual testimony, of both corrections officers and plaintiffs. Using different terminology, such as change-out, does not change the observation of a naked admittee to anything other than what it is—a strip search.

Defendants contend that the Second Circuit has determined that in order to be constitutionally problematic, a strip search must target the breast, genitals, and anus, citing *Weber v. Dell,* 804 F.2d 796 (2d Cir.1986). This misstates the law of this Circuit. In *Weber,* the Second Circuit held that the

> Fourth Amendment precludes prison officials from performing strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest.

804 F.2d at 802. However, the court's finding that a strip/body cavity search is unconstitutional absent reasonable suspicion does not equate to a holding that any less intrusive search comports with the Fourth Amendment. Indeed, the court recognized

that two types of search were at issue in discussing the deference to prison officials when determining "when the intrusion of *strip searches* and *body cavity searches*" are justifiable. *See id.* at 804 (emphasis added). Further the court cited to "eleven circuit court decisions ... hold[ing] similar policies unconstitutional," five of which involved strip (not body cavity) searches. *See id.* at 803, 801 nn. 6–7. Further amplification of the *Weber* decision has since been rendered. *See Walsh v. Franco,* 849 F.2d 66, 69 (2d Cir. 1988) (reiterating its holding in *Weber* that "particularized suspicion is required for strip-searching any person arrested for a misdemeanor or other minor offense"). The *Weber* Court simply did not hold that the breast, genitals, and anus must be targeted in order to run afoul of the Constitution.

■ Defendants further base their entitlement to qualified immunity on the assertion that there is no policy to strip search admittees without regard to reasonable suspicion. Based upon the foregoing, it is clear that there is such a policy, and defendants are not entitled to summary judgment on their qualified immunity defense. Moreover, the individual defendants are not entitled to qualified immunity because it is clearly established that "indiscriminate strip searches" are unconstitutional. *Walsh,* 849 F.2d at 69 (explaining that the *Weber* Court found that the unconstitutionality of indiscriminate strip searches was clearly established in June 1983); *Shain v. Ellison,* 273 F.3d 56, 66 (2d Cir.2001) (explaining that qualified immunity was properly denied because the right to be free of a strip search absent reasonable suspicion was clearly established at the time of incident).

Accordingly, defendants are not entitled to summary judgment.

### C. *Appeal of Magistrate Judge's Decision*

Defendants appeal the oral order of Hon. David E. Peebles, United States Magistrate Judge, made on June 24, 2004 and embodied in a written order dated July 7, 2004, to that extent that the order required production of letters dated March 26, 2004, and April 20, 2004, from defense counsel to non-party Dora Hurd. Plaintiffs oppose the appeal. The order was stayed pending resolution of the appeal.

■ The standard for review of a magistrate judge's decision on non-dispositive matters is whether the magistrate judge's findings are "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. R.Civ.P. 72(a). Clear error may be found "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Stetz v. Reeher Enters., Inc.,* 70 F.Supp.2d 119, 120–21 (N.D.N.Y.1999) (quoting *Vandewalker v. Quandt's Food Serv. Distribs., Inc.,* 934 F.Supp. 42, 48 (N.D.N.Y.1996)); *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Magistrate judges are given broad discretion with respect to discovery disputes which should not be overruled absent a showing of clear abuse of discretion. See *Hasbrouck v. BankAmerica Hous. Servs., Inc.,* 190 F.R.D. 42, 44 (N.D.N.Y.1999).

On March 26, 2004, defense counsel sent two letters addressed to Hurd, to the last two known addresses that were available. On April 14, 2004, plaintiffs disclosed that they intended to depose Hurd as a non-party witness. Defense counsel confirmed that Hurd worked at the Saratoga Correctional Facility, and left a telephone message for her there on April 15, 2004. Hurd returned the call the next day. She stated that she had not received a letter from counsel and she had not been subpoenaed to a deposition. She confirmed to defense counsel that she wished to be represented by them. Defense counsel sent an additional letter to Hurd on April 20, 2004, at her current address, regarding representation.

Judge Peebles found that the letters at issue were not protected by the attorney client privilege or the work-product doctrine.

■ Hurd never received the March 26,-2004 letters. Thus, they were not in her possession and would not be covered by the subpoena. Additionally, because she never received them the Magistrate Judge's reasoning that they were sent prior to the for-

mation of the relationship cannot support finding waiver or lack of privilege. As to the April 20, 2004 letter, it was not, as Judge Peebles stated, "merely" information regarding the representation. Rather, the letter went to great length in explaining the potential conflict with non-party witnesses, the named defendants, and the County. It was clearly erroneous to compel the production of the three letters. Therefore, to the extent that the July 7, 2004, order compelled production of the March 26, 2004, and April 20, 2004, letters, it is set aside. *See* Fed. R.Civ.P. 72(a).

### D. Motion to Certify the Class

■ " 'In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 have been met.' " *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 2153, 40 L.Ed.2d 732 (1974) (quoting *Miller v. Mackey Int'l,* 452 F.2d 424 (5th Cir.1971)). Thus, when deciding a motion to certify a class, the allegations in the complaint are accepted as true. *See Shelter Realty Corp. v. Allied Maint. Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978). "Rule 23 requires a litigant who would bring a class action to overcome two hurdles. First, he must satisfy all the conditions of 23(a) and then he must also convince the court that his action is appropriate under one of the three subdivisions of 23(b)." *Green v. Wolf Corp.,* 406 F.2d 291, 298 (2d Cir.1968); *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997).

■ The plaintiff, as the party seeking class certification, bears the burden of proof in demonstrating that the requirements have been met. *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 291 (2d Cir. 1999); *Verdow v. Sutkowy,* 209 F.R.D. 309, 311 (N.D.N.Y.2002). However, plaintiff is not required to make an extensive evidentiary showing. *Verdow,* 209 F.R.D. at 311. Further, courts are implored to construe liberally the Rule 23 requirements. *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 563 (2d Cir.1968); *Verdow,* 209 F.R.D. at 311.

#### 1. Rule 23(a) Prerequisites

The prerequisites to a class action are: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). In common legal parlance, these requirements are generally referred to as numerosity, commonality, typicality, and adequacy of representation. *See General Tel. Co. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980).

■ The first requirement that plaintiffs must prove under Rule 23(a) is that the prospective class is so numerous that joinder is "impracticable." Fed.R.Civ.P. 23(a)(1). "Impracticable" in this context is not equivalent to "impossible," and plaintiffs need not even precisely quantify the prospective class so long as they reasonably estimate the number of potential class members. *See Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir. 1993); *Verdow,* 209 F.R.D. at 311. The Second Circuit has held that a prospective class of forty or more raises a presumption of numerosity. *See Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995).

■ Plaintiffs assert that booking sheets for prospective class members number over 2,000. Additionally, approximately 1,500 individuals charged with misdemeanors or other minor crimes were admitted to the Jail during 2000, 2001, and 2002. Thus, it is estimated that the class will number over 2,000. Defendants do not challenge these numbers. Rather, they argue essentially that there was no strip search, therefore those 2,000–plus admittees would not fall within the class. Plaintiffs have established sufficient numerosity. *See Consol. Rail Corp.,* 47 F.3d at 483.

■ The second requirement of commonality requires a showing that the prospective class members share common questions of law or fact. Fed.R.Civ.P. 23(a)(2). Where the "claims of all proposed class members

derive from the same [ ] policies and procedures, and are based on the same legal theories," the commonality requirement is met. *McNeill v. New York City Hous. Auth.,* 719 F.Supp. 233, 252 (S.D.N.Y.1989).

▮ Here the representative parties and the members of the proposed class base their Fourth Amendment unreasonable search claims on the unconstitutionality of the Jail change-out procedure. That is, the named plaintiffs and the putative class members have the same legal claims based upon the same official procedure. Accordingly, the commonality requirement is met. *See id.*

▮ The third requirement, typicality, requires that claims or defenses of the representative party or parties are typical of those of the prospective class. Fed.R.Civ.P. 23(a)(3). The representative claims need not be identical to the claims of every class member in order to meet the typicality requirement. *McNeill,* 719 F.Supp. at 252. The claims of the representative parties in this case, while involving a more detailed search than every member of the class, still are based upon a strip search conducted pursuant the Jail change-out policy. Therefore, the typicality requirement is met.

▮ The final requirement under Rule 23(a) is that the representative parties will fairly and adequately protect the interests of the prospective class. Fed.R.Civ.P. 23(a)(4). When determining if this requirement is met, a plaintiff must make two showings: (1) that counsel for the prospective class is qualified, experienced, and generally able to conduct the litigation; and (2) that the class members, especially the representative party, do not have interests antagonistic to one another. *See In re Joint Eastern & Southern Dist. Asbestos Litigation,* 78 F.3d 764, 778 (2d Cir.1996). The attorneys representing the named plaintiffs and the putative class have established that they are qualified, experienced, and are generally able to conduct this litigation. Defendants make no viable arguments to the contrary. Further, the representative plaintiffs and the putative class do not have antagonistic interests. Defendants argue that the named plaintiffs' claims are not typical of the class because

they all involved a more invasive search than some of the class members will have undergone. However, as discussed above, claims need not be identical and the named plaintiffs meet the typicality requirement. Accordingly, the variation in the factual claims do not create an antagonism between the interests of the representative plaintiffs and the class.

The prerequisites of Rule 23(a) are met. Consideration of the requirements of Rules 23(b)(2)and 23(b)(3), upon which plaintiffs' motion for certification is based, will be determinative of the motion.

## 2. *Rule 23(b)(2) Mandatory Class*

▮ This subsection permits class certification if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). In other words, a class will be certified if "broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 162 (2d Cir.2001).

> Where class-wide injunctive or declaratory relief is sought in a (b)(2) ·class action for an alleged group harm, there is a presumption of cohesion and unity between absent class members and the class representatives such that adequate representation will generally safeguard absent class members' interests and thereby satisfy the strictures of due process. This presumption of cohesion and unity continues where incidental damages are also sought because entitlement to such damages does not vary based on the subjective considerations of each class member's claim, but flows directly from a finding of liability on the claims for class-wide injunctive and declaratory relief.

*Id.* at 165 (internal quotations and citations omitted).

▮ In the instant case, the challenged policy, the change-out procedure, is generally applicable to all class members. Therefore, final injunctive relief or corresponding declaratory relief with respect to the class as a

whole is appropriate. *See id.* at 162. Moreover, while monetary damages are sought, the centerpiece of the litigation is elimination of the change-out procedure which is applicable to all admittees without a requirement for reasonable suspicion. Accordingly, class certification under Rule 23(b)(2) is appropriate.

### 3. *Rule 23(b)(3) Money Damages Class*

"Framed for situations in which class action treatment is not as clearly called for as it is in Rule 23(b)(1) and (b)(2) situations, Rule 23(b)(3) permits certification where class suit may nevertheless be convenient and desirable." *Amchem Prods.*, 521 U.S. at 615, 117 S.Ct. at 2245 (internal quotation omitted). Under Rule 23(b)(3), it must be determined whether: (1) " 'questions of law or fact common to the members of the class predominate over any questions affecting only individual members;' " and whether (2) proceeding by class action " 'is superior to other available methods for the fair and efficient adjudication of the controversy.' " *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir.2002) (quoting Fed.R.Civ.P. 23(b)(3)).

 While the predominance requirement of Rule 23(b)(3) is more demanding than the commonality requirement of Rule 23(a)(2), issues applicable to the class will be said to "predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Id.* "Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damages issues." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir.2001).

 Here, the common question is whether the change-out, strip search procedure applicable to all admittees, regardless of whether reasonable suspicion exists that contraband or weapons are possessed, violates the Fourth Amendment. This question does not vary among class members. Questions of fact differing among the members of the class relate to the extent of the search to which each individual was subjected, which would affect the amount of compensatory damages. Although there may be differing facts about the personal involvement of some individual defendants, the predominate questions pertain to the sheriff, Jail administrators, and the Jail policy. Other minor differences between class members, such as what the charges were against each of them, relate to membership in the class but not to other issues.

Efficiency of adjudication would also be increased by litigation as a class action. While there are as many as 2,000 class members, there is one central issue of law-whether the change-out strip search violates the Fourth Amendment. Piece meal litigation by multiple plaintiffs in multiple law suits would not promote efficiency and would be inferior to litigation of the issue in one suit. Thus, a class action would promote the fair and efficient resolution of this controversy. Accordingly, certification of the class under Rule 23(b)(3) is appropriate.

### E. *Preliminary Injunction*

Plaintiffs renew their motion for a preliminary injunction. Defendants oppose.

As an initial matter, a plaintiff must have standing in order to seek injunctive relief. *Shain v. Ellison,* 356 F.3d 211, 215 (2d Cir. 2004). Without standing, subject matter jurisdiction is lacking and injunctive relief cannot be had. *Id.* In order to establish standing, plaintiffs must demonstrate that they " 'sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct.' " *Id.* (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)). Where there is an official policy at issue, "there is a likelihood of recurring injury" and plaintiffs have standing to seek injunctive relief. *Deshawn E. v. Safir,* 156 F.3d 340, 345 (2d Cir.1998).

 A preliminary injunction should issue only where the party seeking such relief shows "that it is likely to suffer irreparable injury if relief is denied [and] also that there is either (1) a likelihood of success on

the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the [movant's] favor." *Procter & Gamble Co. v. Chesebrough–Pond's Inc.*, 747 F.2d 114, 118 (2d Cir.1984); *Otokoyama Co. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir.1999); *Eng v. Smith*, 849 F.2d 80, 81–82 (2d Cir.1988); *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985). Where " 'a preliminary injunction seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the less rigorous fair-ground-for-litigation standard should not be applied.' " *Brown v. Giuliani*, 158 F.R.D. 251, 264 (E.D.N.Y.1994)(quoting *Sweeney v. Bane*, 996 F.2d 1384, 1388 (2d Cir.1993)(internal quotation omitted)); *Connecticut Dep't of Envtl. Protection v. OSHA*, 356 F.3d 226, 230–31 (2d Cir.2004) (noting that where a statutory or regulatory scheme is challenged, the more rigorous likelihood of success standard must be met).

■ Irreparable harm must be imminent, not remote or speculative. *Brown*, 158 F.R.D. at 264 (citing *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989)). Where monetary damages cannot compensate for the injury, the harm is irreparable. *Id.* (citing *Studebaker Corp. v. Gittlin*, 360 F.2d 692, (2d Cir.1966)). Further, "the alleged violation of a constitutional right triggers a finding of irreparable injury." *Connecticut Dep't of Envtl. Protection*, 356 F.3d at 231.

■ In order to establish a likelihood of success on the merits, movants must show that their chance of prevailing is greater than fifty percent. *Abdul Wali*, 754 F.2d at 1025. "[C]onsiderable room for doubt" may remain. *Id.* A greater showing is required, however, where the injunction is mandatory rather than prohibitory. *Eng*, 849 F.2d at 82 (citing *Abdul Wali*, 754 F.2d at 1025). Where the relief sought is mandatory, a "clear showing that the moving party is entitled to the relief requested" must be made. *Abdul Wali*, 754 F.2d at 1025 (internal quotation omitted); *Eng*, 849 F.2d at 82. Additionally, where a preliminary injunction grants substantially all of the relief sought, a substantial likelihood of success on the merits must be established. *Abdul Wali*, 754 F.2d at 1026; *see Eng*, 849 F.2d at 82.

■ Here, the change-out procedure (which has been established constitutes a strip search) is done pursuant to a written policy of the Jail. Further, class certification has been granted. Accordingly, plaintiffs, as a certified class, have standing to seek prospective injunctive relief. *See Deshawn E.*, 156 F.3d at 345.

The plaintiffs allege violation of a constitutional right. Therefore, irreparable harm is established. *See Connecticut Dep't of Envtl. Protection*, 356 F.3d at 231.

■ Finally, plaintiffs must establish a likelihood of success on the merits in order to obtain preliminary injunctive relief. As noted, the evidence submitted by the parties with respect to these motions makes clear that pursuant to the written change-out procedure, each admittee is subjected to a strip search (the visual observation of the naked body of the admittee by a CO). Further, defendants admit that the change-out is accomplished without regard to whether reasonable suspicion indicates that a particular admittee is secreting contraband or a weapon. Finally, there is a strong likelihood that the strip search at issue here, conducted as a matter of course without reasonable suspicion, will be found violative of the Fourth Amendment under *Weber* and its progeny. *See Walsh*, 849 F.2d at 69; *Weber*, 804 F.2d at 801 n. 6, 802.

## V. CONCLUSION

Clarendon has no claim or defense related to this action therefore no common question of law or fact. Thus, intervention pursuant to Rule 24(b) is not proper.

The Jail's change-out procedure, applicable to all admittees without regard to reasonable suspicion, is tantamount to a strip search. Further, qualified immunity is not appropriate where, as here, there was a clearly established right to be free from a strip search in the absence of reasonable suspicion. Therefore, defendants are not entitled to summary judgment.

The March 26, 2004, letters to Dora Hurd were not subject to the subpoena. Further, those letters and the April 20, 2004, letter are protected by the attorney-client privilege and the attorney work product doctrine. Thus, the Magistrate Judge's determinations to the contrary are clearly erroneous. The Order compelling production is vacated.

Plaintiffs meet the numerosity, commonality, typicality, and adequacy of representation prerequisites of Rule 23(a). Additionally, final injunctive or declaratory relief would be appropriate to the class as a whole pertaining to the official Jail change-out policy, meeting the requirements for certification of Rule 23(b)(2). The claims of the putative class members have common questions of law and fact that predominate over such questions as to the individuals. The circumstances of this case present a situation where a class action is a superior method for fair and efficient adjudication of the claims. Thus, the putative class is also appropriate for certification pursuant to Rule 23(b)(3).

The plaintiff class has standing to seek and obtain prospective injunctive relief. Because a constitutional violation is alleged, irreparable harm is established. The Jail's change-out procedure is a strip search by another name; therefore, plaintiffs' have demonstrated a substantial likelihood of success on the merits of the claim. Plaintiffs are entitled to preliminary injunctive relief.

Accordingly, it is ORDERED that

1. Clarendon's motion to intervene is DENIED;

2. Defendants' cross motion for summary judgment is DENIED;

3. The Magistrate Judge's oral order of June 24, 2004, exemplified by a written order on July 7, 2004, is VACATED;

4. Plaintiffs' motion for class certification is GRANTED;

5. Plaintiff certified class is defined as follows:

> All persons in the United States who have been or will be placed into the custody of the Montgomery County Jail after being charged with misdemeanors, violations, violations of probation or parole, traffic infractions or other minor crimes, or held on civil matters, and were or will be strip searched upon their entry into the Montgomery County Jail pursuant to the policy, custom and practice of the Montgomery County Sheriff's Department and the County of Montgomery. The class period commences on April 29, 2000, and extends to the date on which the Montgomery County Sheriff's Department and/or the County of Montgomery are enjoined from, or otherwise cease, enforcing their unconstitutional policy, practice and custom of conducting strip searches absent reasonable suspicion. Specifically excluded from the proposed class are Defendants, and all of their respective affiliates, legal representatives, heirs, successors, employees or assignees.

6. Plaintiffs' motion for a preliminary injunction is GRANTED; and

7. Defendants are PRELIMINARILY ENJOINED from conducting a strip search, as set forth in the Jail's change-out procedure, with regard to all persons being placed into the custody of the Montgomery County Jail after being charged with misdemeanors, violations, violations of probation or parole, traffic infractions or other minor crimes, or held on civil matters, without reasonable suspicion that such persons are secreting contraband and/or weapons.

IT IS SO ORDERED.