07-0893-cv
*Kelsey v. County of Schoharie*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2008

Docket No. 07-0893-cv

(Argued: October 3, 2008          Decided: May 22, 2009)

JOHN KELSEY and TIMOTHY WRIGHT, both individually and on behalf of a class of others similarly situated,

                    Plaintiffs-Appellees,

        v.

THE COUNTY OF SCHOHARIE, JOHN S. BATES JR., both individually and his official capacity as Sheriff of the County of Schoharie, and JIM HAZZARD, both individually and in his capacity as Administrator of the Schoharie County Jail,

                    Defendants-Appellants.

Before:   JACOBS, Chief Judge, and MINER and SOTOMAYOR, Circuit Judges.

        Appeal by defendants-appellants Bates and Hazzard, respectively the Sheriff of Schoharie County, New York, and the Administrator of the Schoharie County Jail, from a Decision and Order of the United States District Court for the Northern District of New York (Kahn, J.) denying their motion for summary judgment in an action for injunction and damages challenging a clothing exchange procedure for newly admitted jail inmates as a strip search violative of the Fourth Amendment when executed without reasonable suspicion, the appellants having asserted, inter alia, the defense of qualified immunity.

        Decision and Order reversed and remanded with instructions to dismiss the action.

        Judge Sotomayor dissents in a separate opinion.

1

Bruce Menken, Jason Rozger, Beranbaum Menken Ben-Asher & Bierman, LLP, New York, New York, for Plaintiffs-Appellees.

E. Robert Keach III, Law Offices of Elmer Robert Keach III, P.C., Amsterdam, New York, for Plaintiffs-Appellees.

Gregg Johnson, Girvin & Ferlazzo, P.C., Albany, New York, for Defendants-Appellants.

MINER, Circuit Judge:

**INTRODUCTION**

Defendants-appellants John S. Bates Jr., Sheriff of Schoharie County, New York, and Lt. Jim Hazzard, Administrator of the Schoharie County Jail (together, the "defendants") appeal from a Decision and Order entered in the United States District Court for the Northern District of New York (Kahn, J.) denying their motion for summary judgment in an action brought against them by plaintiffs-appellees John Kelsey and Timothy Wright (together, the "plaintiffs"). Kelsey v. County of Schoharie, No. 1:04-CV-299, 2007 WL 603406 (N.D.N.Y. Feb. 21, 2007). The County of Schoharie is also named as a defendant in the action and joined in the motion. The plaintiffs seek an injunction and damages, claiming that the clothing exchange procedure for newly admitted inmates at the Schoharie County Jail constitutes a strip search violative of the Fourth Amendment when executed without reasonable suspicion. The defendants, sued in their official and individual capacities, base their motion for summary judgment, inter alia, on the defense of qualified immunity. The learned District Court, identifying a possible constitutional violation, found "material facts" in dispute and therefore rejected the defense of qualified immunity, with leave to reassert the defense "at the proper time." Kelsey, 2007 WL 603406, at *8. For the reasons that follow, we reverse the Decision and Order of the District Court and remand with instructions to dismiss the action.

**BACKGROUND**

I. The Clothing Exchange According To Defendants

The Schoharie County Jail is operated by the Schoharie County Sheriff's Department under the direction of Sheriff Bates. Day-to-day responsibility for the facility is vested in Lt. Hazzard as jail administrator. Bates and Hazzard have established and implemented procedures for the admission of male inmates to the facility and state that they have familiarized and trained all subordinate personnel at the facility in these procedures. Included in the intake procedure is a clothing exchange, whereby newly admitted inmates are issued distinctive facility clothing in exchange for their street clothes. This clothing exchange requirement is applied only to those male inmates who are not expected to make bail and therefore are to be confined in a housing unit at the jail. According to Sheriff Bates,

> [t]he purposes of the clothing issue include, ensuring that each inmate has clean clothing free of infestation and to make sure that inmates are clearly identifiable and can be readily distinguished from visitors, members of the public and staff. For some inmates, the facility-issued clothing is better than the clothing and personal care items they have outside the facility and thus may positively impact their state of mind while being housed at the [jail]. The issuance of clothing is commonly referred to as the clothing exchange process.

Before the clothing exchange, a new inmate undergoes a booking procedure. He is first transported from a sally port to a holding area containing two holding cells next to a control room and booking room. In the holding area, the inmate is

4

required to remove his coat (if any) and empty his pockets. Thereafter, he is subjected to a "pat frisk" and sometimes to a search by a hand-held metal detector, all while the inmate is fully clothed. According to the Sheriff, no other type of search is authorized during the intake period. The inmate then is placed in a holding cell within the holding area until the admitting corrections officer is ready to proceed with the booking process.

The inmate is next required to sit beside a window in the holding area. The booking room is on the other side of the window, through which the inmate is interviewed by the corrections officer. The officer enters the answers to his questions into a computer. The questions pertain to such matters as pedigree, medical information, scars and tattoos. Next, the corrections officer in charge of the booking procedure returns to the holding area, where he photographs and fingerprints the inmate. The inmate remains in his street clothes throughout the booking process.

It is only after the booking process is completed that the clothing exchange takes place for those inmates who are to be confined in one of the housing units. Although there is no written policy for the clothing exchange itself, the defendants insist that they have established a protocol for the clothing exchange and have instructed all jail personnel in the protocol as follows: A corrections officer produces in the holding area a mesh property bag into which the inmate is to place his clothes.

5

The officer instructs the inmate to stand on one side of a 42" x 48" masonry half-wall with the officer on the other side.  The officer then lays out on the half-wall the jail uniform, a 48" long white towel, soap and other personal items.  The inmate is then instructed to disrobe and place his street clothes into the mesh bag, which is held open by the officer on the other side of the half-wall.  The inmate may use the towel for privacy as he disrobes preparatory to taking a required shower and dressing in the jail uniform.

While the inmate is showering, the officer takes the inmate's street clothes to a property room across the hallway from the holding area.  There, the officer inspects the clothing for contraband, tags it, and sends it to the laundry room for washing.  When he returns to the holding area, he escorts the newly clothed inmate to the appropriate housing unit.  The protocol does not call for the officer to conduct a personal search or body inspection or to observe the inmate taking a shower or getting dressed.  Although there is no written policy specifically addressed to the clothing exchange procedure, there is a written policy entitled "Inmate Processing."  Within that policy is a provision for medical screening which provides: "A visual analysis of the inmate will be conducted throughout the admission process."

A written policy for strip searches and body cavity searches has been established at the jail under the title "Control of and Search for Contraband."  It provides that "[a] 'strip/strip frisk

search' shall not be routinely conducted." Such a search is allowed only "[w]here an officer has made a determination that there is reasonable suspicion to believe that the inmate should be searched" or "[w]here an officer has reasonable suspicion to believe an inmate is hiding contraband on his person and/or the inmate is in possession of contraband." The policy provides that "[w]hen inmates cooperate in the conduct of a strip/strip frisk search, the inmate's body will not be touched." Body cavity searches in the jail "[m]ay be authorized only in circumstances where there are compelling reasons to believe that the inmate(s) to be searched have secreted in a rectal/vaginal cavity contraband, the nature of which constitutes a clear threat to the safety and security of the facility and/or a threat to the safety and well being of any person." Sheriff Bates "do[es] not recall a single occasion when a [b]ody cavity search was conducted on an inmate during [his] tenure as Sheriff."

Sheriff Bates has put forth the proposition that "the clothing exchange procedure is not intended as a personal search of the inmate but rather a brief administrative process that precedes newly-admitted inmates['] transport to a housing unit." He has represented, "[u]pon information and belief," that "inmates are never instructed to squat, bend, turn, open their mouth, manipulate their body, or in any other manner expose themselves for a personal search or inspection" during the clothing exchange. Jail Administrator Hazzard avers that corrections officers at the jail have been trained to perform the

7

prescribed clothing exchange procedure and that "[t]he clothing exchange is simply intended to get inmates into the jail uniform and secure their street clothing on their way to housing." However, he is aware of three occasions when the prescribed procedure was not followed: On one occasion, the corrections officer left the holding area and left the inmate alone to change out of his street clothes and into his prison clothes and to shower. On the other two occasions, the corrections officer caused the clothing exchange to take place in the holding cell instead of allowing the inmate the benefit of the privacy afforded by the masonry half-wall.

II. The Clothing Exchange According To Plaintiffs

Plaintiff Kelsey arrived at the Schoharie County Jail on October 16, 2002, having been transported there from the Albany County Jail, where he worked as a corrections officer. He had been arrested for a civil violation of the Family Court Act in connection with a child support matter. He underwent the booking procedure, including photographing and fingerprinting, before the required clothing exchange. He testified at his deposition that a corrections officer laid out the jail uniform on a bench in front of the half-wall. He proceeded to take off his street clothes in the open booking area, as directed, in order to put on the jail uniform. Kelsey asked the officer if he had to remove his underwear, and the officer replied: "Yes. Everything." The officer stood directly in front of Kelsey during the clothing exchange, and Kelsey placed his street clothes into a clear

8

garbage bag at the request of the officer.

In his deposition, Kelsey stated that he asked the officer during the clothing exchange: "Do I have to do this here?" and that the officer answered: "Yes, you do." Kelsey testified that the officer's "eyes were looking up and down my body, so I assume he saw my genitals." Kelsey found the entire process "embarrassing" and "[h]umiliating." Kelsey testified that during the clothing exchange he was not prevented from turning around, from going behind the half-wall or from using the towel or the bag to obscure the officer's view of his body. He also stated that he was not required to lift his arms, to open his mouth, to expose his buttocks or to manipulate any part of his body. He did not indicate that he was touched by the officer in any way.

The Cobleskill Police Department brought plaintiff Wright to the Schoharie County Jail at about 3:30 a.m. on September 5, 2003, after Wright's arrest for driving while intoxicated. In his deposition, Wright testified that, following his interview at the jail, he was placed in a holding cell with the cell door open. An officer then brought him a jail uniform, a white towel, and a mesh bag for his street clothes. Wright sat on a bench in the cell and removed his street clothing, which he placed in the bag. He then proceeded to take a shower as directed, taking the towel with him. He returned to the holding cell with the towel, got dressed in the jail uniform and was escorted to a housing unit. According to Wright, a corrections officer stood in front of him as he removed his street clothes (a process that took one

9

minute) and placed them in the mesh bag provided.  When asked in what direction he was facing as he undressed, Wright testified: "At somewhat of an angle to [the officer], but I can't recall 100 percent which way I was facing.  It was like sort of facing towards the officer."  Wright also testified that when he dressed in the holding cell after the shower, no one was present in the holding area.  In response to a question relating to the mental and emotional stress allegedly suffered, Wright described his experience as "rather unpleasant" and stated: "[I]t was, you know, just a rather humiliating kind of — shameful kind of, just being naked in front of at least one other individual and possibly in the view of others."

Plaintiff Wright's description of the deviations from the clothing exchange protocol is consistent with the deposition testimony of Joseph Kenyon, a corrections officer employed at the Schoharie County Jail.  According to Officer Kenyon, inmates are required to stand in front of him and face him during the entire clothing exchange.  He watches the inmates as they remove their clothing, the disrobing takes place in the "holding cell where the inmate is at," and there is no option to disrobe in private.

III.  The Motion for Summary Judgment and the Decision of the District Court

Relying upon affidavits as well as depositions and other materials obtained during discovery, the defendants moved for summary judgment in the District Court.  They contended that the clothing exchange procedure did not entail a strip search, that

inmates were allowed to preserve their privacy in various ways during the exchange, and that established Jail policy permits a strip search only on reasonable suspicion. Defendants also raised the defense of qualified immunity in the motion. Plaintiffs responded that the clothing exchange process requires a visual examination of each inmate during disrobing and that such examination constitutes an unreasonable search for Fourth Amendment purposes when conducted without reasonable suspicion.

In a written opinion denying the motion for summary judgment,[1] the District Court stated as follows:

> Defendants have not met their burden to prove that there is no issue of material fact as to whether [the jail's] policies and practices require COs to observe inmates as they remove their street clothes. However, a question remains: if a CO w[ere] required to observe an inmate undress, would this procedure constitute an unreasonable search under the Fourth Amendment to the United States Constitution?

Kelsey, 2007 WL 603406, at *5.

Consistently characterizing the clothing exchange as the "Exchange/Strip Search Process" throughout its opinion, the District Court examined the record and concluded that the observation of a newly admitted inmate in the process of disrobing is a search for contraband. Id. at *6. The District Court also noted the defendants' contention that the presence of a corrections officer serves as a deterrent to the transfer or destruction of contraband. Id. at *6. The District Court

---

[1] In the same opinion, the District Court granted plaintiff's motion for class certification. Kelsey, 2007 WL 603406, at *14.

11

concluded: "If this admission is accurate, it can mean only one thing: that the exchange/strip search process is meant to serve as a search for contraband — even when there is no reasonable suspicion to do so." Id. at *7. As the District Court correctly noted, a strip search without reasonable suspicion is prohibited by our precedent. However, the court made no final pronouncement on the constitutionality of the search it had identified: "[T]his Court cannot grant summary judgment to the Defendants while there is credible conflicting evidence in the record regarding the nature of the CO's observation of inmates as they disrobe." Id. The District Court thus did not find that the challenged searches were unreasonable. The court did find, however, that the defendants were amenable to suit individually "[a]s a consequence of their involvement in the maintenance of [the jail's] policies and practices." Id. Finally, the court briefly addressed the qualified immunity defense as follows:

> There remains a dispute regarding material facts related to the constitutionality of the exchange/strip search process. As a result, it would be premature to determine whether Defendants Bates and Hazzard are responsible for violating clearly established constitutional law or are immune from suit under the qualified immunity doctrine. Defendants Bates and Hazzard may renew their defense at the proper time.

Id. at *8.

**ANALYSIS**

I. Of Appealability and Qualified Immunity

It is the District Court's denial of qualified immunity that permits the defendants to bring this appeal to us as an exception to the rule of finality. See Mitchell v. Forsyth, 472 U.S. 511,

12

530 (1985) ("[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.") Interlocutory appeal in this sort of case "is not permitted if the district court's denial of summary judgment for qualified immunity rests on a finding that there were material facts in dispute." Genas v. N.Y. Dep't of Corr. Servs., 75 F.3d 825, 830 (2d Cir. 1996). The Supreme Court teaches that "a district court's summary judgment order that, though entered in a 'qualified immunity' case, determines only a question of 'evidence sufficiency,' i.e., which facts a party may, or may not, be able to prove at trial . . . is not appealable." Johnson v. Jones, 515 U.S. 304, 313 (1995).

Despite the bar to appealability that factual issues may provide in the qualified immunity context, we have observed that

> as long as the defendant can support an immunity defense on stipulated facts, facts accepted for purposes of the appeal, or the plaintiff's version of the facts that the district court deemed available for jury resolution, an interlocutory appeal is available to assert that an immunity defense is established as a matter of law.

Salim v. Proulx, 93 F.3d 86, 90 (2d Cir. 1996). We accept the plaintiffs' version of the facts in making our determination herein, as will be seen. Accordingly, we take jurisdiction over the district court's denial of defendants' motion for summary judgment to the extent that the motion is grounded in qualified immunity, and our review is de novo. See Jones v. Parmley, 465

13

F.3d 46, 55 (2d Cir. 2006).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In assessing an officer's eligibility for the shield, "the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his actions were] lawful, in light of clearly established law and the information the officer[] possessed." Wilson v. Layne, 526 U.S. 603, 615 (1999). Qualified immunity is also said to protect the government officer "if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995) (citing Anderson v. Creighton, 483 U.S. 635, 641 (1987)); see also Martinez v. Simonetti, 202 F.3d 625, 633-34 (2d Cir. 2000).

II.  Of the Threshold Inquiry

Until the issuance of the Supreme Court's opinion in Pearson v. Callahan, 129 S. Ct. 808 (2009), the following threshold inquiry was mandatory:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the inquiry, do the facts alleged show the officers' conduct violated a constitutional right. This must be the initial inquiry.

14

. . . .

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.

Saucier v. Katz, 533 U.S. 194, 201 (2001). While it is now true "that the Saucier protocol should not be regarded as mandatory in all cases, [the Supreme Court] continue[s] to recognize that it is often beneficial." Pearson, 129 S. Ct. at 818. Accordingly, we are no longer required to make a "threshold inquiry" as to the violation of a constitutional right in a qualified immunity context, but we are free to do so. Id. at 821. The inquiry is said to be appropriate in those cases where "discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all." Id. at 818. This is such a case. The Supreme Court's current teaching is that "the Saucier Court was certainly correct in noting that the two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." Id.

The development of constitutional precedent is especially important here, where (1) this Court has not spoken on the issue of the constitutionality of clothing exchange procedures in jails although the issue has been presented in district courts in this circuit, see, e.g., Marriott v. County of Montgomery, 227 F.R.D.

15

159, 169–70 (N.D.N.Y. 2005) (holding that a jail facility's "change-out" procedure was a "strip search" and in violation of the Fourth Amendment to the Constitution); see also Williams v. County of Niagara, No. 06-CV-291A, 2008 WL 4501918, at *2 (W.D.N.Y. Sept. 29, 2008) (involving a class action certification question where the defendants argued, inter alia, that a "'clothing change-out'" procedure in a jail "does not constitute a strip search and is constitutional"); and (2) the constitutionality of clothing exchange procedures in jails may never be developed if this Court were to dispose of all challenges relating to the procedures simply because the procedure is not "clearly established" as a "strip search" violative of the Fourth Amendment.

It is also said that addressing the constitutional issue first may not only avoid the possibility of drawn-out litigation and the imposition of unwarranted liability, but may also serve to clarify official conduct standards. See Sound Aircraft Servs., Inc. v. Town of E. Hampton, 192 F.3d 329, 334 (2d Cir. 1999). We think that all these purposes are served by undertaking the constitutional inquiry first in this case. When the facts, viewed in light most favorable to the plaintiff, do not demonstrate that an officer's conduct violated a constitutional right, the court need not further pursue the qualified immunity inquiry, "and the officer is entitled to summary judgment." Gilles v. Repicky, 511 F.3d 239, 244 (2d Cir. 2007).

16

III. Of Strip Searches and the Fourth Amendment

In undertaking our threshold constitutional inquiry, we first take note of our long-standing precedent covering strip searches of those arrested for misdemeanors:

> The Fourth Amendment requires an individualized "reasonable suspicion that [a misdemeanor] arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee and/or the circumstances of the arrest" before [he] may be lawfully subjected to a strip search.

Hartline v. Gallo, 546 F.3d 95, 100 (2d Cir. 2008) (citing Weber v. Dell, 804 F.2d 796, 802 (2d Cir. 1986)) (first alteration in original); see also Walsh v. Franco, 849 F.2d 66, 68–69 (2d Cir. 1988). The written policy of the Schoharie County Jail tracks the language of our precedent by providing that a strip search may be conducted only "[w]here an officer has made a determination that there is reasonable suspicion to believe that the inmate should be searched" or "[w]here an officer has reasonable suspicion to believe an inmate is hiding contraband on his person and/or the inmate is in possession of contraband." There is to be no touching of the body unless the inmate fails to "cooperate" in the search. A much higher standard is required for body cavity searches: "[c]ompelling reasons to believe that . . . contraband . . . constitut[ing] a clear threat to the safety and security of the facility" is concealed in a body cavity. The version of events at the Schoharie County Jail described by the plaintiffs do not describe a body cavity search, and Sheriff Bates has indicated that no such searches have been conducted at the jail during his tenure as Sheriff.

17

Various terms are used to describe the inspection of a naked body, and the terms are distinguished by the degrees of intrusion involved in the search for contraband.  The term "strip search" is used generally to describe any inspection of the naked body.  See N.G. v. Connecticut, 382 F.3d 225, 228 n.4 (2d Cir. 2007).  An individual being strip searched may be required to move his body in various ways to permit a more complete inspection.  Id.  A "visual body-cavity search" is a strip search that entails the specific examination of the genitals and anus, without any bodily contact by the inspector.  Id.  Finally, a "manual body-cavity search" is a strip search that involves a naked body examination, including a viewing of the genitals and anus, by touching or probing with an instrument.  Id.

IV.  Of the Clothing Exchange at the Schoharie County Jail

For purposes of this appeal, we accept the plaintiffs' description of the clothing exchange procedure, although the procedure they describe appears to deviate in certain respects from the protocol purportedly established by the defendants.[2]  See Salim, 93 F.3d at 90.  We therefore proceed, taking the facts

---

[2]  Although the dissent, in several places, accuses us of having accepted the defendants' version of the facts, that is not so.  Most of the half dozen plaintiffs' "facts" that the dissent claims we ignore are expressly considered in this opinion, as the reader can confirm.  Moreover, the third "fact" identified by the dissent — that Kelsey had to walk naked to obtain his prison uniform — is a distortion of the record.  Kelsey testified that he "reached over" and "grabbed the . . . uniform," not that he "walk[ed] while naked to obtain the uniform."  It is undisputed that the plaintiffs were not entirely deprived of the means for protecting their modesty.

18

in the light most favorable to plaintiffs, to examine the constitutional question presented. See Pearson, 129 S. Ct. at 818.

We first observe that the plaintiffs make no claim that they were subjected to visual or manual body cavity searches. Plaintiff Kelsey testified that a corrections officer stood in front of him during the brief period when he removed his street clothes and put on the jail uniform. Kelsey testified that he "assume[d]" that the officer "saw [his] genitals" during that time. Kelsey was not asked to manipulate his body in any way or to assume any particular position. Nor was he prevented from protecting his privacy by turning away from the officer as he undressed, by concealing the lower half of his body behind the half-wall in front of which he was standing, or by using the towel that was available to him during the clothing exchange. In any event, briefly "seeing" a man's genitals during a clothing exchange does not amount to a strip search.[3]

Plaintiff Wright's characterization of the clothing exchange as a search is even more attenuated. According to Wright, the

---

[3] The dissent argues that "any statement by the majority about the constitutionality of forcing arrestees to strip is dicta." This ignores the entire basis of this lawsuit, which attacks a policy that (on plaintiffs' version of the facts) compels arrestees to remove all of their clothing in the presence of a watchful officer in preparation for showering and changing into prison attire. We assume, as we must, that inmates are required to remove their clothing in the presence of an officer. We nonetheless hold that the clothing exchange process, as described by plaintiffs, was not an unreasonable search under the Fourth Amendment.

19

clothing exchange took place in a holding cell, where he disrobed in one minute as a corrections officer stood in front of him. Wright testified that he undressed "[a]t somewhat of an angle" to the officer but could not "recall 100 percent which way [he] was facing." As best he could describe it, "[it] was like sort of facing toward the officer." Apparently, a towel was available to him as he disrobed, and he took the towel with him as he went to take a shower before returning to the holding cell with the towel. Back in the cell, he dressed in the jail uniform. According to Wright's version of events, no officer was present when he put on the jail uniform. Also, as with Kelsey, Wright was not required to move or display his body in any particular way.

Corrections Officer Kenyon, who supported the testimony of plaintiff Wright, at least to the extent of indicating that the clothing exchange took place in a holding cell (rather than behind the half-wall), declared that "the purpose of the clothing exchange process, as far as I know, is simply to get inmates into the jail uniform and secure their street clothing."[4] Nevertheless, a necessary function of any corrections officer is to observe inmates at all times, whether the inmate is eating, sleeping, showering, undertaking recreational activity or

---

[4] Contrary to the dissent's reading of our opinion, this does not suggest that the subjective intent of the corrections officers is to be considered. It supports only the fact that the corrections officers were charged with effectuating a clothing exchange.

engaging in any other activity within the confines of any jail.

We conclude that the incidental observation of the body of an arrestee during a required clothing exchange, in the manner described by plaintiffs, is not an unreasonable search under the Fourth Amendment. Moreover, it seems to us that a clothing exchange observed by corrections officers under the circumstances described by plaintiffs is related to "maintaining institutional security and preserving internal order and discipline[,] essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." Bell v. Wolfish, 441 U.S. 520, 546 (1979). The objectives served by a clothing exchange, according to Sheriff Bates, include assurance that each inmate has clothing that is clean and free of infestation; that inmates are clearly identifiable and distinguishable from visitors, staff and members of the public; and that a positive state of mind be instilled in each inmate.

In assessing the need to promote the foregoing interests, we recognize that we owe "substantial deference to the professional judgment of prison administrators" such as Sheriff Bates. See Overton v. Bazzetta, 539 U.S. 126, 132 (2003). A clothing exchange is a common practice in jails and prisons as is the need for corrections officers to be vigilant at all times. See, e.g., Marriott, 227 F.R.D. at 169-70; Williams, 2008 WL 4501918, at *2; see also Barber v. Overton, 496 F.3d 449, 463 (6th Cir. 2007) (Cook, J., concurring) ("Corrections officers must be ever

21

vigilant of constant, and often innovative, threats to their safety . . . ." (citation omitted)). "Legitimate goals and policies of the penal institution" support clothing exchanges at jail intakes as well as the watchful gaze of corrections officers over inmates, whether they are clothed or not.[5] Bell, 441 U.S. at 546.

The dissent points out that inmates are afforded privacy when they shower and change into prison attire during the clothing exchange process. From this the dissent infers that defendants have "rejected" the idea that the presence of officers when inmates remove their street clothes furthers security, order, and discipline in the jail. This inference is strained at best; and in any event, it is not for us to decide when officers should be permitted to observe inmates as they go about activities of daily life in jail, or specify (under the Constitution) times when inmates may not be watched. As the dissent observes, the Schoharie County Jail is a "controlled environment," in which inmates have a limited expectation of privacy and freedom of movement. While we have an obligation to set a floor of constitutionality permissible conduct, we are ill-equipped to define the contours of life in jail.

The District Court framed the issue thus: "[I]f a CO w[ere]

---

[5] The dissent contends that our consideration of penological interests is inconsistent with our holding that the clothing exchange procedure did not constitute a Fourth Amendment search. However, that a court must examine penological interests if a constitutional right is implicated does not mean that a court is precluded from considering them in other circumstances.

22

required to observe an inmate undress, would this procedure constitute an unreasonable search under the Fourth Amendment to the United States Constitution?" Kelsey, 2007 WL 603406, at *5. Our answer to this question is that such a procedure is not per se an unreasonable search violative of the Fourth Amendment. In giving this answer, we do not depart from, or erode in anyway, our "clearly established" precedent "that persons charged with a misdemeanor and remanded to a local correctional facility . . . have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons . . . ." Shain v. Ellison, 273 F.3d 56, 66 (2d Cir. 2001); see also N.G. v. Connecticut, 382 F.3d 225 (2d Cir. 2004) (stating that this Court has ruled in several decisions that "strip searches may not be performed upon adults confined after arrest for misdemeanors, in the absence of reasonable suspicion concerning possession of contraband" (citing Shain, 272 F.3d at 62–66; Wachtler v. County of Herkimer, 35 F.3d 77, 81 (2d Cir. 1994); Walsh v. Franco, 849 F.2d 66, 68–69 (2d Cir. 1988); Weber, 804 F.2d at 802)). Our precedents do not control the allegations in this case.

We hold here only that a process for the exchange of personal clothing for prison clothing under the observation of a corrections officer in the manner described by plaintiffs does not implicate the type of privacy protected by the Fourth Amendment nor does it fall within the prohibitions established by our precedents relating to strip searches. Plaintiffs were not required to display or manipulate their body parts in any way.

23

Moreover, Plaintiffs did not deny that methods were available to them to protect viewing of their private parts in the event they desired to make use of such methods.

V. Conclusion

Because the plaintiffs have been unable to identify any constitutional violation on the parts of the individual defendants, the Decision and Order of the District Court is reversed, and the case is remanded with instructions to dismiss the action as against the individual defendants. Because the plaintiffs lack any underlying claim of a deprivation of a constitutional right, the claim of municipal liability on the part of defendant County of Schoharie is to be dismissed as well. See Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995).

24

I dissent because the majority has exercised jurisdiction where it has none and assumed the wrong party's version of the facts. It has also offered dicta that contradicts this Circuit's precedent and disregards the experienced judgment of jail administrators. Under a correct analysis of this case, we would be presented with the following question: During the relevant time period, did our clearly established precedent interpreting the Fourth Amendment permit arrestees for misdemeanors to be forced to expose their private parts to corrections officers ("COs") and inmates without reasonable suspicion? The answer is "no." Accordingly, the judgment of the district court should be affirmed.

Because we are reviewing, on interlocutory appeal, a denial of summary judgment on the ground of qualified immunity, our jurisdiction is limited in two key ways. First, we cannot assert jurisdiction over a question of evidence sufficiency. *Salim v. Proulx*, 93 F.3d 86, 91 (2d Cir. 1996) ("What we may not do . . . is entertain an interlocutory appeal in which a defendant contends that the district court committed an error of law in ruling that the plaintiff's evidence was sufficient to create a jury issue on the facts relevant to the defendant's immunity defense."). Second, we may only assert jurisdiction over this interlocutory appeal if we use the "undisputed facts or plaintiff's version of the facts." *Coons v. Casabella*, 284 F.3d 437, 440 (2d Cir. 2002) (internal quotation marks omitted). The majority violates both principles: it dismisses the district court's finding regarding the sufficiency of plaintiffs' evidence, and it adopts defendants' version of the facts.

The district court found that there existed "issue[s] of material fact as to whether [the jail]'s policies and practices require COs to observe inmates as they remove their street clothes" in what may have amounted to a "strip search process." *Kelsey v. County of Schoharie*, No. 04-cv-299, 2007 WL 603406, at *5 (N.D.N.Y. Feb. 21, 2007). Rejecting the district court's finding, the majority re-evaluates the record and concludes that "[p]laintiffs were not required to display . . . their body parts in any way" and that "methods were available to the[ plaintiffs] to protect viewing of their private parts in the event they desired to make use of such methods."

25

Maj. Op. at 24. The majority never explains how it has the authority to re-weigh the sufficiency of the evidence and conclude that there is no dispute regarding a material fact. Our precedent is clear that "[i]n an interlocutory appeal of a qualified immunity claim, where the parties dispute material facts, the issue of whether there is sufficient evidence to support plaintiff's version of the material facts is within the province of the district court." *Holeman v. City of New London*, 425 F.3d 184, 192 (2d Cir. 2005); *see also Martinez v. Simonetti*, 202 F.3d 625, 632 (2d Cir. 2000) ("[I]mmediate appeal is not permitted if the district court's denial of summary judgment for qualified immunity rests on a finding that there were material facts in dispute . . . ." (internal quotation marks omitted)).

The majority avoids acknowledging its usurpation of the district court's jurisdiction by purporting to conduct an analysis based on plaintiffs' version of the facts. Maj. Op. at 19–21. Yet plaintiffs Kelsey and Wright have alleged that, after being arrested, respectively, for violating a child support order and driving while intoxicated, they were forced to strip naked and be inspected by corrections officers. (*See* Compl. ¶¶ 32-36, 40-43; Dep. of John Kelsey 75:22–76:2 ("I was humiliated. . . . I had another officer strip me down and, you know, staring at me when I was naked."); Dep. of Timothy E. Wright 134:10–13 ("[I]t was, you know, just a rather humiliating kind of—shameful kind of, just being naked in front of at least one other individual and possibly in the view of others.").) Contrary to these allegations, the majority implausibly concludes that Kelsey and Wright volunteered to strip naked and expose their private parts to corrections officers and others, despite several opportunities to guard their privacy. *See* Maj. Op. at 24. In so concluding, the majority is adopting defendants'—not plaintiffs'—version of the facts. (*See* Appellants' Br. at 2 ("This case specifically concerns a procedure . . . that requires inmates to change out of their street clothes and into a facility-issued uniform with partial privacy but in the physical presence of a corrections officer.").)

The majority justifies its approach by excerpting portions of plaintiffs' deposition testimony. For example, the majority emphasizes Kelsey's responses to questions from

26

defendants' counsel to the effect that, during his disrobing, no one prevented him from turning around, hiding behind a half-wall in the booking area, or somehow covering himself with a towel or mesh bag while removing all of his clothes. Maj. Op. at 9, 19. These statements, however, cannot be understood in isolation. Kelsey, according to his own testimony, did not recall having a towel at his disposal when he was removing his clothing. Nonetheless, the majority assumes that a towel was "available" to Kelsey during his disrobing. Maj. Op. at 19.

The majority overlooks or discounts other key details in the deposition testimony of Kelsey and Wright that undermine the majority's conclusion that plaintiffs, by their own admission, could have protected their privacy by turning their backs to the CO,[1] wrapping themselves in a towel or hiding behind a half-wall in the booking area. First, the majority acknowledges but then disregards that one of the COs who may have observed Wright testified that arrestees were "required to stand in front of him and face him during the entire clothing exchange," and that the exchange did not take place near the half-wall or provide the "option to disrobe in private." Maj. Op. at 10-11. Second, the majority simply ignores that Kelsey testified that he was forced to disrobe in full view of a holding cell that contained an inmate, who was standing and laughing at Kelsey. It is questionable whether Kelsey could have avoided the eyes of the CO as well as those of the inmate. Third, the majority dismisses Kelsey's testimony that, because the jail uniform into which he was supposed to change was located on a bench outside of his reach, he had to walk while naked to obtain the uniform.[2] Under those circumstances, it is unclear how Kelsey could have maintained his privacy behind a wall. Fourth, Wright testified that he was forced to strip inside of, or immediately at the gate of, a holding cell, in front of which stood a CO. During his deposition, one of the COs confirmed that he conducted clothing

---

[1] Despite the majority's assumption, it is not clear that an individual's privacy interests would be preserved if he were forced to expose his naked backside to a CO.

[2] Kelsey testified that, in order to reach the bench, "I had to move. I don't know exactly how many steps."

27

exchanges in the holding cell with the arrestee. In order to change behind the half-wall, Wright would have been required to walk away from the holding cell and past the CO. Fifth, although the majority notes that Kelsey and Wright testified that a CO stood in front of them while they were changing, the majority does not fully consider the fact that, according to both parties, the CO was holding the bag into which plaintiffs had to deposit their clothes as they removed them. This would have made it nearly impossible for either arrestee to turn his back to the CO and successfully deposit his clothes in the bag.

Finally, the majority assumes that the obligatory stripping occurred amidst free-spirited dialogue between jail guards and arrestees, instead of (as defendants acknowledge) in a "controlled environment," which both Kelsey and Wright described as "[h]umiliating." In the one instance when Kelsey (who worked as a corrections officer at another jail) questioned the CO regarding the disrobing procedure, Kelsey was informed that he had no other option.[3]

The majority compounds its errors involving jurisdiction and standard-of-review by offering dicta that contradicts this Circuit's precedent. Although concluding that "methods were available to the[ plaintiffs] to protect any viewing of their private parts," Maj. Op. at 24, the majority nonetheless suggests that the disrobing procedure would be constitutional because "briefly 'seeing' a man's genitals during a clothing exchange does not amount to a strip search." Maj. Op. at 20. Then the majority seems to retreat from this statement when it writes, "[w]e hold here only that a process for the exchange of personal clothing for prison clothing under the observation of a corrections officer in the manner described by plaintiffs does not implicate the type of privacy protected by the Fourth Amendment." Maj. Op. at 24. In fact, as discussed, the majority has accepted defendants' version of the facts and concluded that plaintiffs in this case were not required to expose themselves. Accordingly, any statement by the majority about the constitutionality of forcing arrestees to strip naked is dicta.

---

[3] Kelsey testified as follows: "I had asked him [the C.O.], 'Do I have to [do] this here?' 'Do I have to get changed here,' and he said "Yes, you do."

It is, however, puzzling dicta, given this Circuit's precedent on strip searches. *See, e.g.,* *Shain v. Ellison*, 273 F.3d 56, 66 (2d Cir. 2001) ("[P]ersons charged with a misdemeanor and remanded to a local correctional facility . . . have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons . . . ."); *Walsh v. Franco*, 849 F.2d 66, 69 (2d Cir. 1988) ("[T]he unconstitutionality of a blanket policy calling for strip searches of all misdemeanor arrestees was clearly established."). Without explanation, the majority dismisses this Circuit's precedent on strip searches as not "control[ling] the allegations in this case." Maj. Op. at 24. From the majority's opinion, however, one can infer two possible reasons for the majority's summary statement, neither of which is valid under Fourth Amendment jurisprudence.

First, insofar as the majority suggests that "brief[]" exposure of one's private parts does not implicate the Fourth Amendment, Maj. Op. at 20, our precedent does not support the notion that a search need be prolonged or thorough to be termed a "strip search." *See N.G. v. Connecticut*, 382 F.3d 225, 228 n.4 (2d Cir. 2004) ("'Strip search' is often used as an umbrella term that applies to all inspections of naked individuals.").

Second, the majority seems to suggest that the disrobing procedure at issue in this case "does not implicate the type of privacy protected by the Fourth Amendment" (Maj. Op. at 24) and is distinguishable from traditional strip searches of persons charged with misdemeanors because of the motives of the officers conducting the procedure. *See* Maj. Op. at 21 (describing (1) CO's testimony that purpose of strip procedure was merely to exchange clothes, and (2) observation of arrestee's body as "incidental" to "clothing exchange").[4] But the privacy interests protected by the Fourth Amendment do not become irrelevant merely because we use

[4] To the extent that the majority is suggesting that the exact same procedure may or may not amount to an invasion of privacy depending upon the CO's subjective intent, this is improper because "challenged searches are judged 'without regard to the underlying intent or motivation of the officers involved.'" *Hudson v. New York City*, 271 F.3d 62, 68 (2d Cir. 2001) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)).

29

the nomenclature of "clothing exchange" instead of "strip search." *See Marriott v. County of Montgomery*, 227 F.R.D. 159, 169 (N.D.N.Y. 2005) ("Using different terminology, such as change-out, does not change the observation of a naked admittee to anything other than what it is—a strip search."). As the Supreme Court has explained with respect to the act of urination (whose visual or aural monitoring "implicates privacy interests"), "[t]here are few activities in our society more personal or private . . . . Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as by social custom." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 617 (1989) (internal quotation marks omitted). This rationale applies equally strongly to the exposure of one's private parts. *See Justice v. City of Peachtree City*, 961 F.2d 188, 191 (11th Cir. 1992) ("Deeply imbedded in our culture is the belief that people have a reasonable expectation not to be unclothed involuntarily, to be observed unclothed or to have their 'private' parts observed or touched by others." (internal quotation marks and alterations omitted)); *cf. Forts v. Ward*, 621 F.2d 1210, 1217 (2d Cir. 1980) ("The privacy interest entitled to protection concerns the involuntary viewing of private parts of the body by members of the opposite sex.").

Moreover, in analyzing the purpose of the disrobing procedure, the majority again commits the fallacy of adopting defendants' version of disputed facts. Defendants have represented to this Court that the purpose of the procedure is "incidental observation of the inmate where the intent is not to search, but to perform an administrative action in a controlled environment." (Reply Br. for Appellants at 21.) They have also asserted that the procedure is "not intended to be a personal search." (Appellants' Br. at 6.) The majority agrees. It writes of the "incidental observation of the body of an arrestee." Maj. Op. at 21. In contrast, plaintiffs allege that the objective of the disrobing procedure is to search arrestees (*see* Appellees' Br. at 2) and, according to the district court, the record "strongly suggest[ed]," but did not establish, "that the purpose behind the entire exchange/strip search process is to search inmates for contraband."

30

*Kelsey*, 2007 WL 603406, at \*6. If the majority accepted—as it must on this interlocutory appeal—plaintiffs' version of the facts, then it would be compelled to call this procedure what plaintiffs allege it to be: a "strip search."

Having erroneously concluded that the Fourth Amendment is not implicated, the majority nonetheless proceeds to argue that the disputed procedure is constitutionally valid because it is "related to 'maintaining institutional security and preserving internal order and discipline.'" Maj. Op. at 21 (quoting *Bell v. Wolfish*, 441 U.S. 520, 546 (1979)). But a court need only examine penological objectives *if* a constitutional right is implicated. *See Turner v. Safley*, 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). Accordingly, the majority's analysis belies its conclusion: the majority's evaluation of penological objectives is necessary only if—contrary to the majority's conclusion—the disrobing procedure implicates the type of privacy interests protected by the Fourth Amendment.[5]

Nonetheless, it is true that with respect to jails, "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell*, 441 U.S. at 546. But the majority, after implicitly conceding that the disrobing procedure implicates the Fourth Amendment, invokes penological objectives that defendants have rejected and fails to identify essential goals requiring the retraction of Fourth Amendment rights. Although recognizing that it is "ill-equipped to define the contours of life in jail," Maj. Op. at 23, the majority nonetheless "substitute[s] [the Court's] judgment on these difficult and sensitive matters of institutional administration and security for that of the persons who are actually charged with and trained in the running of such facilities." *Block v. Rutherford*, 468 U.S. 576,

---

[5] The majority responds that, regardless of whether a constitutional right is implicated, nothing prevents it from considering penological interests "in other circumstances." Maj. Op. at 22 n.5. But the majority fails to explain what "other circumstances" justify its analysis or how its discussion is relevant to its holding.

31

588 (1984) (internal quotation marks and citations omitted). For example, the majority suggests that the clothing procedure is justified in order to ensure: (1) "that each inmate has clothing that is clean and free of infestation;" (2) "that inmates are clearly indentifiable and distinguishable from visitors, staff and members of the public;" and (3) "that a positive state of mind be instilled in each inmate." Maj. Op. at 21-22. But no one is challenging a jail's authority to require detainees to wear uniforms, and none of these reasons justify requiring an arrestee to strip in front of a CO. *See Bell*, 441 U.S. at 559 ("Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."); *Weber v. Dell*, 804 F.2d 796, 804 (2d Cir. 1986) ("Deference, however, is not a dispensation from the requirement under the Fourth Amendment that searches be reasonable."). Jail administrators have adopted means—other than clothing exchanges—of detecting contraband. In particular, the jail policy (which does not reference clothing exchanges) allows pat searches and searches with a hand-held metal detector upon intake, and it permits strip searches and body cavity searches upon "reasonable suspicion to believe that the inmate should be searched."

The majority also suggests that forcing arrestees to strip naked is justified because COs must "observe inmates at all times." Maj. Op. at 21. But defendants never claim that COs must be omnipercipient. Defendants deny the existence of any blanket jail policy of requiring arrestees to expose themselves. (*See* Appellants' Br. at 2 ("This case specifically concerns a procedure . . . that requires inmates to change out of their street clothes and into a facility-issued uniform with partial privacy but in the physical presence of a corrections officer.").) According to defendants, arrestees are permitted to change behind a half-wall and are informed by COs that they may use a towel for privacy. They further acknowledge that COs do not watch the arrestees showering or changing into their jail uniforms. Defendants do not, therefore, argue that COs must exercise unflagging and perpetual vigilance over every pore of an arrestee's body. Nor, in contrast to the majority, do defendants suggest that some degree of privacy is necessarily

32

anathema to a jail's internal order or that the forced exposure of private parts during a clothing exchange is an integral part of jail security. Accordingly, where defendants, themselves, have conceded that penological interests are satisfied in a manner that does not require the forced exposure of private parts, we should not condone an alleged infringement upon constitutionally protected privacy interests merely because we can imagine an alternative procedure that we might consider to be more effective.

I agree with the majority that it is important for corrections officers to be vigilant and that clothing exchanges can serve important objectives. Maj. Op. at 22. But like the First Circuit and in the absence of reasonable suspicion:

> [o]ur case law on misdemeanor arrestees effectively holds that, even if the only way to be comprehensive in detecting contraband is to perform a strip search, the government must bear the risk of missing some items. . . . [B]alancing constitutional rights and institutional needs may require that, in situations presenting only a remote risk of concealment, we accept less than perfect law enforcement procedures.

*Wood v. Hancock County Sheriff's Dep't*, 354 F.3d 57, 65 n.13 (1st Cir. 2003); *see N.G.*, 382 F.3d at 232 ("[I]n several decisions, we have ruled that strip searches may not be performed upon adults confined after arrest for misdemeanors, in the absence of reasonable suspicion concerning possession of contraband."). If, under plaintiffs' version of the facts, arrestees for misdemeanors could have protected their private parts from exposure, I would have agreed with the majority that Fourth Amendment interests would not be implicated and violated. But that is not the case before us.

Because plaintiffs' version of the facts indicates a constitutional violation of a clearly established right under the Fourth Amendment against unreasonable searches, we should affirm the district court's denial of summary judgment.